DONOHUE *v.* VOSPER.[1]

1. DEEDS—WARRANTY—AFTER ACQUIRED TITLE—EVIDENCE—EXECU-
TION—ESTOPPEL.

   Complainant's predecessor in title entered his claim to tim-
   ber lands in the Upper Peninsula which were part of the
   Fèderal grant for railroad construction enacted in 1866.
   Congress subsequently declared a forfeiture of all prop-
   erty so granted, excepting *bona fide* homestead claims,
   supported by actual occupancy; also confirming title in
   the Lake Superior Canal Company as to a portion. Some
   litigation arose between the canal company and the set-
   tlers, and the United States filed a bill in equity against
   the company and the claimants, aforesaid, whose rights
   were held to depend on the *bona fides* of their homestead
   occupancy—a question later raised and litigated in a suit
   involving the attempted forfeiture. In 1896 a decree was
   entered determining that the company that had succeeded
   to the title and rights of the canal company was vested
   with title and that the complainants had no interest
   therein; and the company's rights were quieted by the
   final order of the court. The predecessor in title obtained
   a quitclaim of these corporate rights and conveyed the
   lands to complainant. In 1908 the complainant and de-
   fendant joined in a lease of the property for mining pur-
   poses, carrying out the provisions of a previous option.
   Defendants' rights were based on an alleged deed of a
   quarter interest from complainant, who denied its execu-
   tion. *Held*, on appeal, that the evidence to impeach the
   deed was insufficient to satisfy the burden of proof in such
   cases and that the usual presumption arising from the
   acknowledgment should prevail; also that complainant
   was estopped by his deed, with the accompanying war-
   ranties, from asserting any claim upon the basis of inter-
   ests secured thereafter.

2. SAME—PRESUMPTIONS—ACKNOWLEDGMENT.

   The notarial certificate of a sealed conveyance carries with

---

[1]Removed to the Supreme Court of the United States by writ
of error March 16, 1916.

it the presumption that the officer who made it certified to the truth and that he was not guilty of wrongful action.

3. SAME—DECREE—RECITALS—REAL PROPERTY.

Where the Federal decree, in addition to other findings, recited that the title to the said real property at the time of commencement of suit was vested in the canal company (passing thence to its successor), and that complainant and defendants had no rights in the lands at the time of commencing suit, the decree did not transfer any interest from complainant and his grantee to the corporation, hence, no warranties passed with the real estate to the corporation and its quitclaim deed to complainant and defendant created no rights in them by reason of any covenants of warranty in a previous conveyance. *Held,* also, that it was not because of a release contained in the decree that defendant had no title, as found by the court, but the decree determined as of the time stated that he owned no interest to be affected by the release.

4. SAME—INURING OF TITLE.

But possession of the said lands held by the warrantor necessarily inured to the benefit of the defendant when complainant later acquired title.

5. SAME—EVICTION—ESTOPPEL.

One claiming estoppel by warranty must show that he has been evicted before he can set up the estoppel by virtue of covenants in his conveyance.

6. SAME—REMEDY.

The subsequently acquired estate passes by direct operation of law without the intervention of equity or of any other court.

7. SAME—NOTICE—QUITCLAIM.

The grantee under a quitclaim deed takes with notice of any defects in his grantor's title and subject to previous unrecorded warranty deeds.

8. SAME—STATUTES—CONSTRUCTION—RETROACTIVE EFFECT.

Complainant is not aided by Act No. 199, Pub. Acts 1915, or 3 Comp. Laws, § 8988, changing the rule of law as to notice in case of conveyance by quitclaim, because nothing contained in the statute indicates the intent of the legislature to change the rule as to conveyances already made. It is a general rule that statutes are not to be con-

strued retroactively, unless it clearly appears that such was the intention of the legislative body.

9. ADVERSE POSSESSION—LIMITATION OF ACTIONS—COTENANTS—NOTICE.

If one of several cotenants, in the occupancy of lands, purposes to acquire title by hostile tenure, as against his cotenants, the proof of his denial of their right should be clear and unambiguous and must be brought home to their knowledge by express notice or by implication: the case may not be made out by inference.

10. SAME—TENANTS IN COMMON—NOTICE.

The possession of one of two tenants in common is of right and does not import adverse possession, and the presumption arising from such occupation must be overcome by conduct inconsistent with the recognition of existing rights in other tenants in common.

11. SAME—RECOGNITION—TENANTS IN COMMON—ARRESTING OPERATION OF STATUTE.

By executing with the several cotenants an option, and, thereafter, a mining lease of the holding in common, the tenant in possession recognized their rights and stopped the running of the statute as against them.

Appeal from Iron; Flannigan, J. Submitted October 11, 1915. (Docket No. 38.) Decided December 21, 1915.

Bill by Martin Donohue against Benjamin Vosper, Fred H. Abbott, Maurice J. Tonkin and the Buffalo Iron Mining Company, to quiet title to real property. From a decree for defendants, complainant appeals. Affirmed.

*A. H. Ryall*, for complainant.

*Dan H. Ball* and *Martin S. McDonough*, for defendants.

KUHN, J. The complainant seeks by his bill to quiet the title to an undivided one-fourth interest in certain land which it is the claim of the defendants was conveyed to the defendant Vosper by a warranty deed from

the complainant's grantor. This deed antedated a quit-claim deed given to the complainant by his grantor. In their answer the defendants, excepting the mining company, claimed the benefit of a cross-bill, and prayed that the title to the lands might be quieted against the complainant.

The land involved in this litigation was included in certain old grants by the United States government to the State of Michigan to aid in the construction of two railroads, one to Marquette and the other to Ontonagon. It was a part of the "common lands" at the intersection of the proposed railroads. The lands applicable to the Marquette road were released by the State to the United States, and later, in 1866, under an act of Congress (Act July 3, 1866, chap. 160, 14 U. S. Stat. p. 80), granting lands to the State for canal purposes, these lands inured to the benefit of a canal company by grant from the State. The lands to be used for the benefit of the Ontonagon road were not released, and the United States Supreme Court, in a suit hereinafter referred to, adjudged that the title to an undivided half of the "common lands" still remained in the State for the purposes of this road, except as affected by an act of Congress in 1889 (Act March 2, 1889, chap. 414, 25 U. S. Stat. p. 1008), by which Congress declared a forfeiture of grants in the State of Michigan for all unconstructed railroads, and confirmed the title of all persons who had made cash entries within the limits of those grants, and all persons claiming under State selection, such as the canal company. By an exception in the act, title was not confirmed in those lands on which they were *bona fide* pre-emption or homestead claims, asserted by actual occupation on May 1, 1888. Michael Donohue, the complainant's grantor, together with various other persons, had entered upon these common lands as pre-emptors and homesteaders.

Prior to the act of 1889 the canal company had

brought ejectment suits against these settlers. In 1890, at the instigation of persons claiming as pre-emptors and homesteaders under the act of 1889, the United States filed a bill against the canal company and others, claiming all these lands were lands of the United States and subject to entry under the homestead and pre-emption act, and prayed that the canal company be restrained from exercising acts of ownership on the land, particularly cutting timber. The canal company claimed the lands as having vested in it by the granting act and the confirmatory act of 1889, and that none of the pre-emption or homestead claims were within the exception of the latter act.

In 1894 the canal company's ejectment suit was decided by the judgment of the Supreme Court hereinbefore referred to, which adjudged that the title to an undivided half of the "common lands" still remained in the State after the release of the lands granted for the construction of the Marquette Railroad; that the title of the canal company to the lands selected to it by the State was confirmed by the Act of 1889, subject to the exceptions provided in the act; and that it should be determined in an equity suit in the United States court what lands came within the excepting clause. But by the act of 1889, referred to, the title of the State to the lands granted for the Ontonagon Railroad, including an undivided half of the common lands, was forfeited to the United States.

After the judgment in the Supreme Court of the United States, the defendant Vosper, who had defended the ejectment suit for Donohue and the other homestead and pre-emption claimants, took from Donohue a warranty deed on December 29, 1894, for an undivided quarter interest in the land claimed by him, leaving a quarter interest in Donohue and a half interest in the canal company. It is asserted by defendant Vosper that he took this deed for legal services performed.

In the suit of 1890 by the United States against the canal company, the latter filed a cross-bill against the claimants, including Donohue, claiming the title to all the land. The issue in that litigation, therefore, was whether Donohue and the other claimants were *bona fide* homesteaders or pre-emptors on May 1, 1888. On September 8, 1896, a number of the claimants, including Donohue, and Vosper claiming under him, consented to a decree, quieting title to the lands in the Keweenaw Association, Limited, successor to the canal company, which was entered on November, 1896. That decree, the effect of which is disputed and becomes important in this litigation, contained the following provisions:

"It is ordered, adjudged, and decreed * * * that the title to the lands hereinafter described, * * * at the time of the commencement of this suit, was fully and completely vested in the Lake Superior Ship Canal, Railway & Iron Company, as in part satisfaction of the grant to the State of Michigan by the act of Congress of July 3, 1866, and has, since the commencement of this suit, become, and is now fully and completely vested in said Keweenaw Association, Limited, and that neither the United States of America nor any of the defendants aforesaid, consenting to this decree, has any right, title, or interest therein.

"And it is further ordered, adjudged, and decreed that the title of said Keweenaw Association, Limited, in and to each and every of the parcels of the land hereinafter described, be, and the same is hereby, forever quieted in the said Keweenaw Association, Limited, as against the said United States of America and each and every of the said defendants in the said cross-bill hereto consenting and herein named.

"This decree shall stand and operate as a release and conveyance from the United States, and each and every of the other of said defendants, of all right and title to said lands, and may be recorded as such in the records of the proper county."

On November 19, 1896, the Keweenaw Association,

Limited, conveyed the land in suit by quitclaim deed to Donohue. It is the contention of Vosper that he and Donohue agreed to this arrangement, by which a sum of money was to be paid for the timber cut and the land was to be conveyed by the Keweenaw Association, Limited, to Donohue. On December 3, 1896, Michael Donohue delivered to the complainant, Martin Donohue, a quitclaim deed of the premises. On April 3, 1908, defendant Vosper quitclaimed an undivided one-eighth interest in the lands to the defendant Abbott, and on December 18, 1908, the complainant joined with the defendants Vosper and Abbott in the execution and delivery of an option for a mining lease of the premises. On or about February 3, 1909, defendant Abbott quitclaimed an undivided one thirty-second interest in the mineral to the defendant Tonkin, and on March 7, 1910, complainant joined with the defendants Vosper, Abbott, and Tonkin in the execution and delivery of a mining lease of the premises pursuant to the option given before. The mining lease, which was for a term of 30 years, was issued to the Niagara Iron Mining Company as lessee, and was by that company assigned to the defendant, the Buffalo Iron Mining Company. From the date of the lease until the assignment thereof to the defendant mining company, the Niagara Iron Mining Company was, and from that time forward the defendant mining company has been and is now, in possession of the premises for mining purposes.

The complainant makes the following contentions:

(1) That the deed of 1894 from Michael Donohue to Vosper, was not signed, acknowledged, nor delivered by Donohue.

(2) That the decree of 1896 entirely cut off any right Vosper may have had in the land under the warranty deed of 1894.

(3) That he was a purchaser in good faith without notice of Vosper's claim.

(4) That the record of Vosper's deed was defective, and therefore not constructive notice to the complainant.

(5) That the complainant and his grantor have been in continuous adverse possession of the land since 1883, by virtue of which he has acquired a valid title as against Vosper.

1. The first contention of complainant raises the only material question of fact in dispute in this case, as to whether the warranty deed of December 29, 1894, which purports to have been executed by Michael Donohue, was executed and delivered by him to the defendant Vosper. Complainant seeks to disprove the execution of this deed by the testimony of Michael Donohue, to the effect that he does not recollect the making of such a deed, and that he was not at Iron River on the 29th day of December, 1894, and by his testimony that both he and Michael were at Iron River on Christmas day of that year, but went back to the camp where they were working, some 10 or 12 miles away, on the 26th of December; and the testimony of Jesse Allen that Michael Donohue was cooking at the camp mentioned at or about Christmas time in 1894. Upon hearing all the testimony, seeing the witnesses, and comparing the signature on the deed with other signatures of Donohue which were fully authenticated, the learned trial judge found as a matter of fact that Michael Donohue, with full knowledge of what he was doing, and with an intention to convey as in the instrument set forth, signed, acknowledged, and delivered to the defendant a warranty deed on December 29, 1894, and that the consideration which he received therefor was valuable and adequate. After careful examination of the testimony, we are of the opinion that the complainant has not met the burden of proof which rests upon a person who seeks to deny the execution and acknowledgment of such a deed. It is a well established rule that the certificate of a notary carries with it the usual presump-

tion that the officer making it has certified to the truth, and has not been guilty of wrongful or criminal action. See *Hourtienne* v. *Schnoor,* 33 Mich. 274; *Johnson* v. *Van Velsor,* 43 Mich. 208, 219 (5 N. W. 265) ; *Cameron* v. *Culkins,* 44 Mich. 531 (7 N. W. 157) ; *Dikeman* v. *Arnold,* 78 Mich. 455, 470 (44 N. W. 407). We are therefore in agreement with the circuit judge's finding of fact as to the complainant's first contention.

2. The next contention of complainant involves the effect of the decree of the Federal court. It is urged that this decree should stand and operate as a release and conveyance from the United States, Donohue, and Vosper to the Keweenaw Association, Limited, of "all right and title to said lands ;" that since the covenant of warranty in the deed runs with the land, it went with the decretal conveyance to the association with the consent of Vosper, and from the association back to Michael Donohue, in whom it was extinguished; and that Vosper therefore lost any rights which he might have had under the covenant. The difficulty with this contention, however, is that the decree in terms provides that neither Donohue nor Vosper had any right, title, or interest in the land, as it recites that Donohue, Vosper, and the United States "acknowledge that the said Keweenaw Association, Limited, is, and the said Lake Superior Ship Canal, Railway and Iron Company was, at the time of the commencement of this suit, the lawful owner in fee of the lands hereinafter described, * * * " and adjudges—

"that the title to the lands hereinafter described * * * at the time of the commencement of this suit, was fully and completely vested in the Lake Superior Ship Canal, Railway & Iron Company, * * * and has, since the commencement of this suit, become, and is now fully and completely, vested in said Keweenaw Association, Limited," etc.

Now if the title was completely in the canal company at the commencement of the suit (December 18,

1890, which antedates the time of the warranty deed to
Vosper), and went from it to the Keweenaw Associa-
tion before the decree, how could the decree carry any
interest in the land from Donohue and Vosper to the
Keweenaw Association? And we do not think that it
can be contended that Vosper was adjudged to have no
title *as a result* of the release clause in the decree, since
there was nothing to be released if he had no interest.
As was said by the learned trial judge, the right which
accrued to Vosper under the breaches of the covenants
of warranty found in the Donohue deed was a mere
right of action for damages for the breach up to the
time that Donohue acquired title under the deed to him
from the Keweenaw Association, which right of action
it is not claimed was transferred to the Keweenaw As-
sociation by the operation of the decree. The effect of
the decree then was to oust Vosper from the land, of
which he had the actual or constructive possession of
an undivided quarter interest, it appearing that
Michael Donohue continued in possession of the un-
divided one-half of the claim from the time of his
original entry until his quitclaim deed to the complain-
ant, despite the alleged trespasses of the canal company
and its successor, which possession would inure to Vos-
per under the warranty deed. (For it must be said that
Donohue was holding possession under Vosper after
December 29, 1894, of the undivided quarter interest.)
The decree established a paramount title in a third
party, and thus evicted Vosper from his title and pos-
session in the undivided quarter. This is important
because Vosper must show an eviction before he can
claim the remedy of an estoppel by the covenant of war-
ranty in his deed. See *Matteson* v. *Vaughn,* 38 Mich.
373; Rawle on Covenants for Title (5th Ed.), §§ 131-
140.

It thus becomes a clear case for the application of
the doctrine of estoppel by warranty in Vosper's favor.

The rule is that a grantor who assumes to convey property by warranty deed when the title is in a third person will, together with his subsequent grantees with notice, be estopped from setting up against the first grantee an after-acquired title. The American courts have uniformly held that the after-acquired estate passes by direct operation of law, without the intervention of any court or the aid of a suit in equity or action at law on the covenants, to the covenantee. See Rawle, *supra,* § 248; Maupin on Marketable Title to Real Estate (2d Ed.), § 213. This doctrine has received the approbation of this court. *Lee* v. *Clary,* 38 Mich. 223, 226; *Fisher* v. *Hallock,* 50 Mich. 463, 465 (15 N. W. 552); *Pfirrman* v. *Wattles,* 86 Mich. 254, 258 (49 N. W. 40). Therefore, whatever title Michael Donohue acquired, by the quitclaim deed from the Keweenaw Association on November 19, 1896, passed directly to Vos-per, unless the complainant can be said to be a subsequent purchaser in good faith without notice. This brings us to a discussion of the third contention of the complainant.

3. Under the decisions of this court, one who takes by quitclaim takes with notice of defects in his grantor's title and subject to previous unrecorded warranty deeds. *Peters* v. *Cartier,* 80 Mich. 124, 129 (45 N. W. 73, 20 Am. St. Rep. 508); *Beakley* v. *Robert,* 120 Mich. 210 (79 N. W. 193); *Hoffman* v. *Simpson,* 121 Mich. 502 (80 N. W. 1133); *Messenger* v. *Peter,* 129 Mich. 93 (88 N. W. 209); *Zeigler* v. *Coal Co.,* 150 Mich. 82 (113 N. W. 775, 13 Am. & Eng. Ann. Cas. 90); *Backus* v. *Cowley,* 162 Mich. 592 (127 N. W. 775); *Pellow* v. *Iron Co.,* 164 Mich. 87 (128 N. W. 918, 47 L. R. A. [N. S.] 573, Am. & Eng. Ann. Cas. 1912B, 827); *Walker* v. *Schultz,* 175 Mich. 280, 292 (141 N. W. 543).

Counsel for complainant contends that, assuming that the deed as recorded was not constructive notice to the complainant when he made his purchase, by rea-

son of a defective record, Act No. 199, Pub. Acts 1915, has changed the rule that has obtained for many years in this State relative to the standing of a grantee in a quitclaim deed, and it is his claim that the act merely establishes a new rule of evidence, which is applicable to cases arising before the act took effect as well as since.  Act No. 199, Pub. Acts 1915, provides as follows:

"Every conveyance of real estate within the State, hereafter made, which shall not be recorded·as provided in this chapter, shall·be void as against any subsequent purchaser in good faith and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded. The fact that such first recorded conveyance is in the form or contains the terms of a deed of quitclaim and release shall not affect the question of good faith of such subsequent purchaser, or be of itself notice to him of any unrecorded conveyance of the same real estate or any part thereof."

It is an amendment of section 8988, 3 Comp. Laws, which reads as follows:

"Every conveyance of real estate within this State, hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith, and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded."

We are of the opinion that the language of the amendment does not indicate that it was contemplated by the legislature that it should affect conveyances already made.  The language is:

"The fact that such  *  *  *  recorded conveyance is in the form or contains the terms of a  *  *  *  quitclaim and release shall not affect the question of good faith of such subsequent purchaser, or be of itself notice to him of any unrecorded conveyance of the same real estate or any part thereof."

It is a rule that an act of the legislature is not to be construed as retroactive unless it affirmatively or clearly appears from the act itself that such was the intention. *Smith* v. *Humphrey*, 20 Mich. 398; *Fuller* y. *City of Grand Rapids*, 40 Mich. 395; *Maxwell* v. *Bridge Co.*, 46 Mich. 278, 287 (9 N. W. 410); *Phillips* v. *Township of New Buffalo*, 68 Mich. 217, 219 (35 N. W. 918); *In re Lambrecht*, 137 Mich. 450, 453 (100 N. W. 606); *Davis* v. *Railroad Co.*, 147 Mich. 479 (111 N. W. 76). And in our opinion it cannot be said that the act in question clearly states or necessarily implies that it is to have a retroactive effect, but rather the implication is to the contrary. We do not think it was the intention of the legislature to unsettle long-established titles, which the other construction contended for by the complainant might cause.

5. The last contention of the complainant's counsel is that the complainant and his grantor, Michael Donohue, had been in possession for more than 15 years, and therefore Vosper's title is barred. With reference to this, there is no contention between counsel as to the soundness of the legal propositions advanced by complainant, viz., that a grantor may obtain title against his grantee, and a tenant in common against his cotenant, by adverse possession. The contention of counsel for the defendants is that, while these legal propositions are well grounded, it is also true that before a tenant in common may acquire a title against his cotenant by adverse possession, the proofs must be clear and cogent, and the case cannot be made out by inference. *Yelverton* v. *Steele*, 40 Mich. 538. *Campau* v. *Campau*, 44 Mich. 31, 34 (5 N. W. 1063), is cited, where it is held by this court that:

"Such exclusive claim and denial of their right should be clear and unambiguous, and brought home to the knowledge of the cotenants, either by express notice or by implication. And if the latter, all doubt growing out

of the nature and character thereof should be against an ouster. The presumption should be that the tenant in possession respects and recognizes the rights of his cotenants, until the contrary clearly appears; that the possession is rightful, and not to the exclusion of others having equal rights."

See, also, *Rich* v. *Mining Co.*, 147 Fed. 380 (77 C. C. A. 558).

The reason for this rule, in our opinion, is apparent, because the possession itself is rightful and does not import adverse possession, as would that of a stranger. So that the presumption of occupation as a cotenant must be overcome by acts and declarations which are clearly inconsistent therewith, and which are brought home to the cotenant. Michael Donohue, at the time of his deed to Vosper, was in possession. He then conveyed to Vosper an undivided quarter and remained in possession. Martin Donohue was living with his brother at the time, and after he received the deed from Michael in December, 1896, he continued to remain there, his possession being of the same nature as that of Michael, which continued until the execution of the mining lease. Since that time the complainant has resided upon and farmed a portion of the land, being permitted to do so by the terms of the mining lease so long as his occupancy did not interfere with the mining operation.

In 1908, an application having been made for a mining option on the land, Martin Donohue claims to have first heard that Vosper claimed to have a deed from Michael Donohue of an interest in the land. He then claimed that no such deed had been made, and that he had received a letter from his brother denying that he had made any such deed. This was his first denial of Vosper's rights. But it seems to us that if he denied Vosper's title, he could not consistently join with Vosper in executing an option for a lease and the lease it-

self, unless it should be by an agreement which denied Vosper's rights. It was the opinion of the circuit judge—in which we concur—that it would be absurd to hold under the proofs in this case that, during the period from the execution of the deed to Vosper to the delivery of the Keweenaw Association deed to Michael, the latter was holding adversely to Vosper, or that Vosper knew or believed, or had the slightest reason to suspect, that Donohue repudiated his rights under his deed. During this period the things which were done on or concerning the land by complainant were as consistent with a full recognition of Vosper's title as the contrary. And until shortly before the execution of the option in 1908, no notice, actual or by implication, that the quarter interest in controversy was claimed by either Michael or the complainant was brought home to Vosper. In any event, the running of the statute was arrested by the recognition of Vosper's and Abbott's titles by the execution of the option in December, 1908, which was repeated on March 7, 1910, by the execution of the lease therein provided for.

The case of *Houlihan* v. *Fogarty,* 162 Mich. 492 (127 N. W. 793), is cited by complainant's counsel, but we think that case is readily distinguishable from the situation here presented. In that case the effect of a recital or admission of title in the lease on the running of the statute was not involved nor decided.

When Martin Donohue, in the instrument above referred to, acknowledged that he was holding possession subject to the titles of Vosper and Abbott, it is urged with reason that they had no occasion to commence any suit, as such conduct on the part of the complainant would reasonably lead them to the belief and conviction that such adverse claims had been abandoned. We are therefore of the opinion that there is no merit in the complainant's claim of adverse possession.

The decree of the lower court in dismissing the bill of complaint and quieting the title of the defendants Vosper, Abbott, and Tonkin as prayed for in the cross-bill will therefore be affirmed, with costs to the defendants.

BROOKE, C. J., and PERSON, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.