[No. 1309.]

ALICE McDONALD, Appellant, *v.* ISABELLA FOX, Respondent.

ADVERSE POSSESSION—EVIDENCE.—Action to recover land claimed by plaintiff on the ground of adverse possession. Evidence reviewed and held sufficient to sustain a verdict in favor of defendant.

IDEM—POSSESSION—INTENTION.—The actual and peaceable possession of land does not necessarily make the possession adverse to the true owner. It depends upon the intention of and the character of the claim asserted by the party in possession.

IDEM—BOUNDARY LINE—MISTAKE.—If a party occupies land up to a fence which he believes to be on the boundary line of his land, but having no intention to claim up to the fence if it should be beyond the line, an indispensable element of adverse possession is wanting.

IDEM—POSSESSION—EVIDENCE—BURDEN OF PROOF.—Possession is *prima facie* evidence of ownership, and a recovery in ejectment may be had upon it; but the mere possession of another's land is not *prima facie* adverse to the true owner. When it is shown that the true title is in another, the intendment in favor of the possession ceases, and the burden is upon the party to show that his possession has been hostile to the true owner.

APPEAL from the District Court of the State of Nevada, Storey County.

RICHARD RISING, District Judge.

*W. E. F. Deal,* for Appellant.

I. Respondent acquired no title to the land in dispute by virtue of either of her deeds, as her grantor was not in possession of that portion of the lot in dispute at the time, and appellant was in the adverse possession, and had been so for a longer period than was required by the laws of this state. (Tyler Eject., 935; *Peabody* v. *Hewett,* 52 Me. 33; 83 Am. Dec. 498.)

II. An actual adverse possession of the land, such as was shown in this case, gave the appellant a better title than that of the respondent, by virtue of her deeds. (*Arrington* v. *Liscom,* 34 Cal. 381; 94 Am. Dec. 722; *Cannon* v. *Stockmon,* 36 Cal. 540; *Lamb* v. *Davenport,* 1 Saw. 620; *Williams* v. *Sutton,* 43 Cal. 73; Abb. Tr. Ev. 715; 2 Greenl. Ev. 430; *420 Mining Co.* v. *Bullion M. Co.,* 3 Saw. 638; *Hughes* v. *Graves,* 39 Vt. 359; 94 Am. Dec. 331; *McArthur* v. *Carrie's Adm'r,* 32 Ala. 75; 70 Am. Dec. 529; *McCoy* v. *Morrow,* 18 Ill. 519; 68 Am. Dec. 578; *Austin* v. *Bailey,* 37 Vt.

219; 86 Am. Dec. 703; *Boynton* v. *Longley*, 19 Nev. 76; 3 Am. St.
Rep. 781; *Smith* v. *Logan*, 18 Nev. 154; *Abernathie* v. *Con. Va. M.
Co.*, 16 Nev. 269.)

III. The land in dispute is the separate property of appel-
lant, and she, as the sole heir-at-law of her husband, has the
right to maintain this action. (*Gossage* v. *Crown Pt. M. Co.*, 14
Nev. 160.)

IV. An easement to light and air supplied to the windows of
one person from the premises of another cannot be acquired by
prescription. (*Pierre* v. *Fernald*, 26 Me. 436; 46 Am. Dec. 573;
*Hayden* v. *Dutcher*, 31 N. J. Eq. 219; *King* v. *Miller*, 4 Halst. Ch.
559; 55 Am. Dec. 246; *Rogers* v. *Sawin*, 10 Gray, 376; *Carrig* v. *Dee*,
14 Gray, 583; Wash. Ease. 613; 6 Am. & Eng. Ency. Law, 152.)

*C. E. Mack*, for Respondent.

By the Court, HAWLEY, C. J.:

This is an action of ejectment.   Appellant and respondent
are the owners of adjoining lots on E street, in Virginia City.
Appellant's house is situate on lot 2 in block 146, range D, and
respondent's house is on lot 1 in the same block.   There is a
space of about six feet between their respective houses.   The
true division line is nearly in the center of this space, and the
ground in controversy has a frontage of about three feet adjoin-
ing the house of respondent, and extends back the depth of the
lots.  Appellant insists that there is no evidence to sustain the
verdict of the jury; that there is no conflict in the evidence; and
that the court erred in refusing to grant her a new trial.
Respondent holds the legal title to the lot upon which her
house stands.   Appellant relies solely upon actual possession
of the ground in dispute, claiming that she has occupied, and had
the exclusive use of, the entire space of ground between the two
houses for a period of over fifteen years.

Is this claim clearly established by the evidence? Appellant
was the wife of John Murray, and about six months prior to his
death, in 1870, they moved into the house on lot two.   She tes-
tified that at the time "there was a fence on the north side
marking the division line between the lot where the defendant
now lives" and her lot; that "that fence continued there until
Mr. Bielfelt, who was then the owner of the lot where defend-
ant lives, built his house, when the fence was torn down, and

the south line, or side of his house was built on the line
where the fence stood.    That house is now occupied by defend-
ant"    She further testified as follows:    "There is a space
between my house and the south side of defendant's house,
which is my yard.    There is no entrance into the yard from
Mrs. Fox's house, nor has there ever been any door or other
opening, excepting the windows of defendant's house, to that
yard.    The door of my kitchen opens into this yard, and has
always done so ever since I lived in the house, since 1869.    No
one has ever used my yard except myself and my first husband
in his lifetime, and myself afterwards, and my present husband
and those who lodged in my house.    The space at the rear of
this yard is filled by a privy, except about fourteen inches be-
tween the privy and the defendant's house, and that privy has
been there ever since 1869, and has never been used by anybody
that ever owned or claimed defendant's lot.    The front of the
yard is closed by a door which extends from my house to de-
fendant's house.    This has always been so, ever since 1874
when Mr. Bielfelt built his house.    Last fall I had a
fence built on my north line.    This fence extended the
whole length or depth of my lot, and was up to the
eaves of defendant's house, and covered the defendant's win-
dows on both stories.    On the sixth of November, 1888, the
defendant tore this fence down, and built a fence south of her
house and upon my lot, and took in the part of my lot last
described in the complaint on file in this action.    This fence
extended from the door on E street to the middle of the door of
the privy in the rear, being about two feet ten inches of my lot
on E street, and four feet two inches in the rear.    *  *  *  De-
fendant has held possession ever since.    She was never in my
yard except by permission until she tore down my fence and
put up hers.    When she came to live at the house on her lot,
about a year ago, she could not find the keys, and she, by my
permission, came into my yard and got into her house through
one of the windows, and afterwards she went into my yard to
fix her stove-pipe."    Edward McDonald, the present husband of
appellant, testified that "when Bielfelt built the house now on
defendant's lot, in 1874, he wanted to build his house right up
to his south line, and asked permission of plaintiff to take down
the fence and build his house up to the division line between
the two lots, and make the south side of his house the division

line between the two lots.   By my advice the plaintiff gave
Bielfelt permission to do as he asked, and the south side of his
house was built up to the place where the fence was." The
testimony of appellant was corroborated by the testimony of
other witnesses as to the situation of the premises, and as to
the use and occupancy of the space between the houses.

Two witnesses on the part of respondent testified, one of them,
that he had known lots one and two for twenty-six years, the
other, for sixteen years; that they had passed by them almost
daily during that time, and did not remember of seeing any
fence between said lots before Bielfelt built his house.   Two
other witnesses testified that they had frequently passed the
gate between the two houses, and always saw it opened, and
that "the boards between the privy in the rear of the space be-
tween the two houses appear to have been placed there recently,
and that they never saw them until recently."   Respondent
introduced conveyances of the east fifty feet of lot one in block
one hundred and forty-six, range D, conveying title thereto,
through divers parties, from September 18, 1861, up to and
including a deed to Bielfelt on October 31, 1874.   In 1875 Biel-
felt gave a mortgage to said lot, which was foreclosed in 1881,
and J. C. Hampton, the purchaser at sheriff's sale, conveyed the
premises to respondent by a quit-claim deed in February, 1887.
Respondent, in her own behalf, testified as follows:     "When I
bought the lot on which my house stands, in February, 1887,
J. C. Hampton   *   *   *   told me that the south line of the lot
ran where the fence now stands between my house and plaint-
iff's house.   I put up that fence last November, after I had a
high fence torn down, which plaintiff had built along the south
side of my house, which shut out the light and covered my
windows on the south side of my house up to the eaves.   *   *   *
When I went to look at my house on my lot, before I bought
it, the keys could not be found, and I got into my house by
going through the gate between my house and plaintiff's house.
Since I bought the house I went into the space   *   *   *   to fix
a stovepipe on that side of my house.   Plaintiff never made any
objection to my going there.   I claimed the part of the lot I
fenced in as part of my lot I bought from Mr. Hampton.   I
never made any use of it except as I have stated.   *   *   *   The
door between plaintiff's house and mine is between an inch

board fastened to my house and a similar board fastened to plaintiff's house.

It is well settled that the facts relied upon to establish an adverse possession, in cases of this kind, must be clearly proved. The law presumes that the possession of land is always under the regular title. The presumption, therefore, is that the respondent and those under whom she claims and derives title, having entered into the possession of the house on lot 1 under the legal title, were in possession of the entire lot—of all the ground called for by their deeds—which includes the strip of ground in controversy. To overcome this presumption, the burden was upon appellant to affirmatively establish such facts, by clear and competent proof, as are necessary to constitute an adverse possession. The actual and peaceable possession of land does not necessarily make the possession adverse to the true owner. It depends upon the intention of, and the character of the claim asserted by, the party in possession. The possession, to be adverse, must be inconsistent with the title of the true owner, who is out of possession, and of such a character as to operate as notice to him that the possession is held under a claim of right, or color of title sufficient to establish an ouster of the owner. It must be accompanied with a claim, by the party in possession, exclusive of the right of others. It must be hostile in its inception; actual, peaceable, open, notorious, continuous, and uninterrupted for the period prescribed by the statute. (*Thompson* v. *Pioche*, 44 Cal. 517; *Thompson* v. *Felton*, 54 Cal. 547; *Mauldin* v. *Cox*, 67 Cal. 387; *Gildehaus* v. *Whiting*, 39 Kan. 711; *Yelverton* v. *Steele*, 40 Mich. 538; *Sherin* v. *Brackett*, 36 Minn. 154; *Dixon* v. *Cook*, 47 Miss. 220; *Brophy Mining Co.* v. *Brophy etc. Mining Co.*, 15 Nev. 101; *Satterwhite* v. *Rosser*, 61 Tex. 171; *Bracken* v. *Jones*, 63 Tex. 184; *Evans* v. *Templeton*, 69 Tex. 378; 5 Am. St. Rep. 71; Tyler Ej. 860, 864, 874-883; Ang. Lim., Sec. 390, 396.) It was for the jury, guided by these elementary principles, to determine, from the evidence, the real intention of appellant. " It is the occupation, with an intent to claim against the true owner, * * * which renders the entry and possession adverse. * * * Indeed, that it is the intention to claim title which makes the possession of the holder of the land adverse is the doctrine upon which the decision in every case proceeds. If it be clear that there is no such intention, there can be no pretense of an adverse possession. * *. * Ques-

tions of adverse possession thus depending upon the intention of the possessor, and the knowledge, or the means of knowledge, on the part of the owner of the land, are questions of fact (as well as of law) to be determined by a jury as the best means of ascertaining their truth.    They are questions of law on which the court has a right to instruct the jury; and, in finding the *quo animo*, the jury must, of course, be left to their own view of the effect of the evidence."    (Id. p. 399.)

The question as to whether there was any fence upon the premises prior to the building of the Bielfelt house is rendered doubtful, and the jury may have believed from the testimony that no such fence existed, or, at least, that appellant was mistaken in testifying that there was a fence "marking the division line" between the two lots, for the fence, if any existed, was not upon "the division line," according to the official map of Virginia City.    The east fifty feet of lot one, as testified to by Surveyor Haist, "embraces the land upon which defendant's house is built, and also that portion of the space between plaintiff's and defendant's house inclosed by a fence which takes in about one-half of the space between the two houses." If the jurors were satisfied that a fence existed, they were justified in finding that, at the time Bielfelt built his house, he believed it was upon the division line, and that neither he nor appellant then knew the true state of facts.    It does not appear that there was then any dispute as to where the line ran, or that there was any agreement between the parties that the line of the fence should be the division line between the lots.    If Bielfelt was deceived or mistaken upon this point, his acts in asking permission to tear down the fence so as to build his house on the division line would not estop him, or those claiming under him, from thereafter asserting title to the whole lot when the true facts were ascertained.    There is nothing in appellant's testimony inconsistent with the theory that the parties were, at that time, mistaken as to the line, and that her asserted possession was then only to lot 2.    In *Brown* v. *Cockerell*, 33 Ala. 45, the court said: "If a party occupies land up to a certain fence, because he believes it to be the line, but having no intention to claim up to the fence if it should be beyond the line, an indispensable element of adverse possession is wanting.    The intent to claim does not exist, and the claim which is set up is upon the con-

dition that the fence is upon the line. Or, if the fence is put over the line from mere convenience, the occupation and exercise of ownership are without claim of title, and the possession could not be adverse." (See also, *Alexander* v. *Wheeler*, 69 Ala. 340; *Skinner* v. *Crawford*, 54 Iowa, 121; *State* v. *Salts*, 77 Iowa, 193; *Bolden* v. *Sherman*, 101 Ill. 486; *Lincoln* v. *Edgecomb*, 31 Me. 345; *Knowlton* v. *Smith*, 36 Mo. 513; *Tamm* v. *Kellogg*, 49 Mo. 122; *Houx* v. *Batteen*, 68 Mo. 84; *Huckshorn* v. *Hartwig*, 81 Mo. 648; *Keen* v. *Schnedler*, 92 Mo. 516; *Bradford* v. *Guthrie*, 4 Brewst. 362; *Hacker* v. *Horlemus*, 69 Wis. 286; Ang. Lim., Sec. 390.) There is much in the testimony which tends to show that appellant did not assert any claim to the ground in dispute until the time of the erection of the high fence. In March, 1870, after the death of her first husband, she filed an inventory of his estate, claiming simply "lot two in block one hundred and forty-six, range D, as laid down and described in the official map of the city of Virginia." She did not then claim the land up to the fence unless she was mistaken as to the true division line. Her possession of the ground in dispute was not hostile at that time. On the twenty-third day of April, 1877, appellant filed a declaration of homestead to lot two in block one hundred and forty-six. This was three years after the building of the Bielfelt house, and she did not at that time claim any ground except lot two, for which she held the legal title. The door in front is attached to both houses—as much to one as to the other—and, for aught that appears in the testimony, it may have been placed there by the owner of lot one. The fact that there was a side door to appellant's house opening into the space, which enabled her to use the ground between the houses as a yard, and that there was no door from respondent's house opening into this space, is a circumstance in her favor in determining her exclusive possession. The maintenance of the privy in the rear certainly establishes her actual possession of the ground upon which it stands; but in the light of all the testimony submitted by the respective parties, it was for the jury to decide whether she had the actual possession of the entire ground in dispute; whether her use of the ground was owing simply to the situation of the premises, and not from any openly asserted claim of ownership; whether it was only the ordinary possession that might be had in any

case where there is an open space between houses on adjoining lots on each side of the division line, without any intention of asserting any claim to the ground over the line, or whether her possession was actual and exclusive under a claim of right adverse to the true owner.    Possession is *prima facie* evidence of ownership, and a recovery in ejectment may be had upon it; but the mere possession of another's land is not *prima facie* adverse to the true owner.    Whenever it is shown that the true title is in another, the intendment in favor of the possession ceases, and the burden is upon the party to show that his possession has been hostile to the true owner.    "Adverse possession includes exclusive possession, which is only an ingredient in its composition.    The exclusive possession must have a character that does not ordinarily belong to it, and that character must be proved to the satisfaction of the jury like any other fact.    It can never be assumed, as a matter of law, from mere exclusive possession, however long continued." (*Russell* v. *Davis*, 38 Conn. 565; *Grube* v. *Wells*, 34 Iowa, 148; *Skinner* v. *Crawford*, *supra; Miller* v. *Downing*, 54 N. Y. 631; *Ricard* v. *Williams*, 7 Wheat. 105; Ang. Lim., Sec. 384.)    The case of *Grube* v. *Wells* is in many respects similar to the case under consideration.    The parties were transposed.    The plaintiff in that action was the owner of lot two hundred and sixty in the city of Burlington.    Defendant owned lot one adjoining plaintiff's lot on the south, and her grantor had the lot inclosed for twenty-five years.    The fence on the north was set about fifteen feet over the line upon lot two hundred and sixty, which was uninclosed, and the fence remained in that condition until about five years prior to the action.    The defendant and her grantor had the actual possession, and exercised rights of ownership over the strip of land in controversy after its inclosure, but had never had any other right or color of title than such as resulted from the possession.    They held the land under the belief that it was covered by the deeds conveying to them lot one, and were not otherwise informed until within one year prior to the action, when an accurate survey was made, and the true line established.    The defendant had paid taxes continuously on lot one, and the plaintiff on lot two hundred and sixty. The questions that were presented to the court were the same as is presented here, viz.:    whether the defendant was protected in her possession of the land in dispute by the statute of limita-

tions, and whether the possession relied upon was of such a character as is deemed by the law adverse. The judgment there, as here, was in favor of the owner of the legal title. The supreme court, after declaring the legal principles substantially the same as we have announced, and commenting upon the facts, said: " The intention — the *quo animo* of the possessor— must be shown. This cannot be done by mere proof of possession. It must be shown to exist under certain conditions, to be qualified by the existence of a claim of right. * * * In this case we have the possession admitted. As we have seen, it must be shown to be adverse under a claim of right. Simple belief on the part of defendant of her right to the land, we have pointed out, is not equivalent to, nor will it supply the place of, the claim required by the law; and, as we have shown, possession will not establish the *quo animo*. There is, then, in the case, absolutely no evidence of the adverse holding of defendant."

It follows from the views we have expressed, and from the authorities we have cited, that the claim of appellant—that there is no evidence to sustain the verdict—is not well founded. The judgment of the district court, and the order refusing a new trial, are affirmed.